No. 47,300

KENNETH FRANKLIN, *Appellee*, v. NORTHWEST DRILLING COMPANY, INC., *Appellant.*

(524 P. 2d 1194)

Opinion filed July 17, 1974.

*Thomas J. Kerwin,* of Hindry & Meyer, P. C., of Denver, Colorado, argued the cause, and John S. McGuire, of the same firm, and *Keith R. Willoughby,* of Lowe & Willoughby, of Colby, were with him on the brief for the appellant.

*Edward Larson,* of Jeter & Larson, of Hays, and *Selby S. Soward,* of Zuspann, Soward, Whalen & Burr, of Goodland, both argued the cause and were on the brief for the appellee, The Prudential Insurance Company of America,

Assignee of the Judgment of Kenneth Franklin. *James Milliken*, of Milliken & Wilks, of St. Francis, was on the brief for Kenneth Franklin.

The opinion of the court was delivered by

FROMME, J.: This action arose from an oral arrangement to drill and equip an irrigation well on land owned by the plaintiff Kenneth Franklin in Sherman County, Kansas. The defendant Northwest Drilling Co., Inc. undertook to drill and equip the well with knowledge that the financing for the well and equipment was dependent upon obtaining a 900 gallon well. Financing was furnished by Prudential Insurance Company after the well was drilled. Franklin encountered difficulties in his irrigation project later and sued Northwest Drilling. The petition set forth three separate theories upon which recovery was sought, (1) breach of an express warranty that the well and equipment would produce 1200 gallons of water per minute (gpm), (2) breach of an implied warranty that the well and equipment were reasonably fit to provide an adequate water supply for irrigation purposes, and (3) negligence by the defendant in testing, drilling and equipping said well. Issues were joined by answer of the defendant and a trial resulted in a jury verdict in favor of plaintiff in the amount of $16,180.53. The verdict exceeded the total paid by plaintiff for drilling and equipping the well by over $2,000.00. The defendant appeals.

At the outset we are confronted by appellee's motion to dismiss the appeal for failure of the appellant to comply with the rules relating to appellate practice. Rule 6 (*c*) of this court requires that the testimony of witnesses designated for inclusion in the record be in narrative form except when the decision of any question in controversy may depend upon the verbal accuracy of said testimony. Rule 6 (*e*) requires the record to be abbreviated and all matter not essential to the decision on appeal should be omitted. (Rules of the Supreme Court, 211 Kan. xxvi, xxvii and xxviii.)

Rule 6 (*e*) provides:

". . . A party need not designate all the evidence to support a claim on his part that it does not show or tend to show a certain fact, but may present such questions by inserting in his designation a statement that no evidence was introduced tending to show the fact, and if an adverse party desires to controvert this he shall include in his designation so much of the evidence as he relies upon to support his contention in this regard. . . ."

The above rule further provides:

". . . For any infraction of this rule or for the unnecessary substitution by one party of evidence in question and answer form for a fair narrative

statement proposed by another, the Supreme Court may withhold or impose costs as the circumstances of the case and discouragement of like conduct in the future may require; and costs may be imposed upon offending attorneys or parties."

In the present appeal the appellant copied the entire court reporter's transcript of proceedings in the court below, together with all pleadings and papers filed in the case. The record furnished this court consists of two volumes containing some 465 pages. The punitive sanctions set forth in Rule 6 (e) of the Rules of the Supreme Court are justified in this appeal and the costs of the transcript and the record on appeal in this case are hereby imposed upon the appellant Northwest Drilling Company. (Rules of the Supreme Court, 211 Kan. xxvii and xxxviii.)

Appellee urges dismissal of this appeal for the further reason that the amended designation of the record and the amended statement of points which appellant attempts to present on appeal were filed out of time, without permission and without a finding of excusable neglect by the trial court.

Rule 6 (d) of this court in part provides:

". . . After the expiration of the period for designation of additional portions of the record, an appellant may not amend his statement of points relied on except by stipulation of the parties or order of the judge on such terms as will be just for the opposing parties. . . ." (Rules of the Supreme Court, 211 Kan. xxvii.)

Rule 6 (p) provides:

"Whenever an appellant fails to complete any step necessary to the docketing of an appeal within the time prescribed by this rule, he shall be deemed to have abandoned the appeal unless the time for such step shall be extended by the Judge of the court from which the appeal is taken for good cause and after reasonable notice to the other parties. . . . No application for an extension of time in which to complete any step may be considered by the Judge of the court from which the appeal is taken unless such application is filed prior to the expiration of the period of time which is sought to be extended, except in those cases where the failure to file such application before the time has expired is the result of excusable neglect. The refusal of the Judge to extend the time for the completion of any such steps shall be final, unless the Supreme Court shall upon immediate application, filed in accordance with Rule No. 7, find such refusal to have been an abuse of discretion and shall grant such extension as justice may require. . . ." (Rules of the Supreme Court, 211 Kan. xxix and xxx.)

No application was made by appellant under Rules 6 (p) and 7 to permit these filings in this court; nor did the trial court declare the appeal abandoned as was the case in *Cribbs v. Pacific Intermountain Express*, 208 Kan. 813, 494 P. 2d 1142. The trial court

merely denied any right of the appellant to make additional amendments and permitted the appellant to proceed with the appeal on the three original points stated. The trial court, in considering the motion to declare the entire appeal abandoned, said:

". . . I know both this Court and the Supreme Court dislike to do that sort of thing. I think a man has a right to have appeal matters heard so long as possible. . . . This Court is going to permit, treat it as having been timely filed and grant additional time so that whatever is necessary to have been filed will be permitted to be filed *except the amendments.* . . ." (Emphasis added.)

Therefore we conclude as in *Van Brunt, Executrix v. Jackson,* 212 Kan. 621, 625, 512 P. 2d 517, that an affirmative finding of excusable neglect is inherent in the trial court's order overruling the motion to declare the appeal abandoned. We will consider the appeal on the merits but limit our consideration thereof to the three points as originally stated and filed.

Before considering the three points stated the facts developed by the evidence should be noted. Kenneth Franklin had no previous experience in irrigation farming when the present well was drilled. He became interested in irrigation in January, 1969, and hired Foust Supply Company, an irrigation company, to first drill a test hole on his land. Franklin testified that Foust furnished a log on the 341 foot test hole and reported the gravel tested was favorable for a 1000 to 1200 gpm irrigation well. The Franklin land was located in proven territory where irrigation wells of that capacity were common. His neighbors were irrigating crops of corn and sugar beets.

Franklin needed financing and contacted a real estate and loan broker in Scott City, Kansas, by the name of Don Hansen. An application for loan was made through Hansen to Prudential Insurance Company. Prudential issued its commitment which was limited to expire May 31, 1969, and the commitment provided that all funds were to be withheld until completition of a well producing a minimum of 800 gpm. The commitment further required the land to be planted in crops in 1969. The land was in grass. Sod had to be broken up and crops planted before June 1. Foust Supply Company could not meet the drilling deadline and Hansen suggested that Franklin see Northwest Drilling Company, which was owned by Ben Haaz of Scott City. That company advised it would meet this deadline. Franklin then talked with Paul Frisbie, an equipment salesman who worked part time for Northwest Drilling, and they

arrived at an estimate of the cost of suitable equipment for the future well based upon information in the Foust test log and Franklin's statement that a 1200 gallon well was possible. This was on March 11, 1969. The loan commitment was not issued until around the last of March. Northwest Drilling Company was then notified of the issuance of a commitment. In April, Northwest Drilling Company drilled a second test hole on the premises and the driller informed Franklin the test had a better gravel showing than the Foust test. Franklin had no direct conversation with Ben Haaz after the loan commitment was issued until the well was being drilled in May, 1969. On May 21, 1969, when the Prudential loan was closed, Don Hansen attended and brought a bill for the cost of the drilling and the equipment due Northwest Drilling Company. The drilling cost came to $4,433.00 and the cost of equipment totaled $9,578.39, a total of $14,011.39.

Franklin refused to approve payment at this time because the well was not hooked up and operating. Payment was approved and the money was released on May 29, 1969, after the well was hooked up and put into operation. The evidence on the quantity of water available and being pumped from the well on May 29, 1969, is conflicting. There is testimony that the well was pumped for a period of four hours at a rate of 1200 gpm. There is other testimony that during the 1969 crop year the well did not produce enough water to irrigate 68 acres of sugar beets and 60 acres of corn and that it pumped air and sand with the water. The following year there were additional tests made with a sprinkler system indicating a flow of only 550 gallons of water per minute. In the winter of 1970, the well was further tested and the maximum sustained flow which could be maintained was around 603 gpm.

Additional evidence was introduced to indicate that Northwest Drilling equipped the well with a pump and motor suitable for a 1200 gpm well without conducting adequate production tests, after the well was drilled, to be certain of the quantity of water available. There was further testimony by an expert that equipment for a 1200 gpm well was more expensive, had to operate at higher speeds and would not operate properly on a well which would produce only 600 gpm. In addition there was testimony that the hole was negligently drilled, that an obstruction was encountered during the testing at 245 feet and that the bottom of the hole had been drilled 12 feet into the shale. Further testimony indicated that the

"Johnson screen" was improperly placed in the shale and that the type of perforations in the casing above the screen was not proper under the current standards of the industry. So there was evidence introduced from which a jury might find negligence or breach of the implied covenant to complete the drilling and equipping of the irrigation well in a workmanlike manner.

Much confusion arose during the trial over submitting the case to the jury on the three theories of plaintiff's case. The trial court refused to consider submitting the case on special questions to the jury. So we are confronted with a record which does not indicate the basis upon which the jury returned the general verdict of over $16,000.00.

On the first theory of recovery the trial court instructed the jury that the plaintiff claimed the defendant expressly warranted that the well would produce 1200 gpm when completed. We have carefully examined the record and find no evidence to support such a claim. At the close of plaintiff's evidence defendant moved for a summary judgment (directed verdict, see K. S. A. 60-250) as to any claim based on express warranty. The motion was renewed at the close of all evidence and denied by the court. We feel the trial court erred and that the case should not have been submitted to the jury under the express warranty theory. It is possible that the error was not prejudicial. If the jury based its verdict solely on negligence in drilling and improperly completing the well in an unworkmanlike manner no prejudice at the trial would have resulted. However, in the absence of answers to special questions we cannot determine the matter.

The appellee contends that the point was not properly raised on appeal. The point as stated by appellant is "The Court erred in giving instruction number five on express warranties as there is no evidence from which the jury could have found [an] express warranty was made." The record indicates no objection was specifically made at the time of the trial to Instruction No. 5. A party on appeal may not be heard to complain of an instruction given by the trial court to which no objection was made unless it is erroneous as a matter of law. (*Hagood v. Hall*, 211 Kan. 46, 49, 505 P. 2d 736.) However, the objection is not really directed to the form or content of the instruction but is directed toward lack of evidence. We believe the point sufficiently raises the question of the insufficiency of the evidence to support plaintiff's first theory of recovery, for

although the point seems to question the giving of an instruction the real thrust thereof is directed toward the insufficiency of the evidence to support a claim of express warranty. We hold the point is properly raised and the court erred in failing to sustain a directed verdict on plaintiff's first cause of action at the close of all evidence.

The second point as stated by appellant is:

"The Court erred in giving instruction number six on implied warranties as implied warranties apply only to sale of goods and such warranties do not extend to nor arise in the amount of water which may be withdrawn from the ground as stated in the instruction; and there was no defect from which jury could find breach of such warranty."

Instruction No. 6 reads:

"When the seller at the time of contracting for a sale has reason to know of any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose.

"*In the absence of any specification in a contract as to the quantity of water to be secured there is implied, a warranty reasonably sufficient for the purpose for which the contractor knew the well was to be used.*

"A seller who breaches this warranty is liable to the buyer of such goods who sustains a loss as a result." (Emphasis added.)

We note in passing the first and third paragraphs of this instruction relate to the purchase and sale of goods, while the second paragraph relates to services rendered in drilling an irrigation well.

Appellee calls this court's attention to K. S. A. 60-251 (*b*) which provides:

"No party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict stating distinctly the matter to which he objects and the grounds of his objection *unless the instruction is clearly erroneous.* Opportunity shall be given to make the objections out of the hearing of the jury." (Emphasis ours.)

The objection made by the appellant during the trial was not specifically directed toward Instruction No. 6. Instruction No. 4 was mentioned during arguments over the instructions.

Instruction No. 4 reads:

"A warranty is a collateral engagement or undertaking, express or implied, that a certain fact regarding the subject of a contract is, or shall be, as it is expressly or impliedly declared or promised to be. Breach of such an engagement does not avoid the contract but renders the warrantor liable for damages."

In directing the court's attention to this instruction the attorney for the appellant in effect argued that in the absence of an express warranty on the quantity of water there could be no implied war-

ranty that the well when completed would produce any particular amount of water. This argument, although germane to Instruction No. 4, was also applicable to the second paragraph of Instruction No. 6 which advised the jury, "In the absence of any specification in a contract as to the quantity of water to be secured there is implied, a warranty [that the well would produce water] reasonably sufficient for the purpose for which the contractor knew the well was to be used." We will examine this portion of the court's instruction to determine if the instruction was clearly erroneous as a matter of law.

The question is complicated by the fact that the loose oral arrangement to drill and equip the well included $4,433.00 for services in drilling the well and $9,578.39 for the cost of the equipment necessary to pump the water.

The uniform commercial code provides:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose. (84-2-315.)

This provision applies to the sale of goods such as the engine, pump, casing and other equipment. It does not apply to the rendition of services such as the drilling of the hole. There was some evidence that repairs were made to the equipment during the three years the well was being operated by Franklin but no serious contention was raised in the evidence that the equipment was not fit for the purpose sold, *i. e.*, to pump 1,200 gallons of water per minute from a 340 foot irrigation well, provided that quantity of water was available. So we will limit our inquiry on this point to whether an implied warranty on the quantity of water to be obtained arises from an agreement to drill and equip an irrigation well.

The only case in Kansas which discusses the question is *Schofield v. School District*, 105 Kan. 343, 184 Pac. 480, 7 A. L. R. 788. In *Schofield* a contractor agreed to drill a "water well" for a school district in a first class manner with machinery of a specified make. The water found was not suitable for drinking and the director of the district advised the contractor to stop further drilling at 293 feet. In holding that the contractor had complied with his contract and was entitled to payment without finding suitable water, the court said:

". . . Contracts for the digging or drilling of wells often provide that payment shall depend upon the obtaining of water, but to be given that effect such a purpose ought to be made to appear by express statement or very clear implication, especially where the contractor does not choose the site. 'If the agreement is executed without provision that a specific flow of water shall be obtained . . . then the labor and materials must be paid for as per contract, be the flow of water little or much.' *Omaha Consolidated Vinegar Co. v. Burns,* 49 Neb. 229, 233. . . ." (105 Kan. p. 346.)

In 90 A. L. R. 2d 1346, Anno: Water Well-Drilling Contracts, the cases from other jurisdictions are collected on this subject. At page 1352 of the annotation the author comments:

". . . One of the few general rules which can safely be formulated is that there is no implied warranty on the part of a driller that the well will be productive, or, if productive, as to either the quantity or quality of the water obtained . . ., but that there is an implied warranty on his part that he will perform the work in a workmanlike manner, with such skill as may ordinarily be expected from those who undertake such work. . . ."

Appearing also in the annotation is the following statement:

"It has generally been held that in the absence of a provision in a well-drilling contract guaranteeing the results of the undertaking there is no implied warranty on the part of the driller as to the quantity of water which will be obtained." (Id. at 1353. See also 56 Am. Jur., Waters, § 146, p. 620.)

A majority of the cases in which the question has been considered have followed this rule. The courts have commented on the uncertainty of obtaining a certain quantity or quality of water, however skillfully the work of drilling is done. The ultimate production of water is unknown to both parties both as to quantity and quality because of uncertainties which may exist beyond the control of the driller and which may not be apparent even after a test hole is drilled. The matter of quantity and quality of any water to be obtained as a result of the services of a driller is therefore left to express agreement. The well driller may expressly agree with the land owner to provide a certain quantity or quality of water but in the absence of such an express agreement no implied warranty arises on the part of the driller as to these matters. The only implied warranty by the driller is that he will drill and equip the well in a workmanlike manner and furnish equipment suitable to perform the particular purpose for which the goods were ordered and required with such skill as may ordinarily be expected from those who undertake such work. Therefore we conclude that the second paragraph of Instruction No. 6 was clearly erroneous as a matter of law.

In the absence of an express provision guaranteeing the results of a well drilling contract there is no implied warranty on the part of a driller as to either the quantity or quality of water to be obtained. When a well driller undertakes to drill an irrigation well, in the absence of any express warranty, the only implied warranty on his part as to drilling is that he will perform the work in a workmanlike manner, with such skill as may ordinarily be expected from those who undertake this work. When a well driller undertakes to equip an irrigation well, and he as seller at the time of contracting for a sale of the equipment has reason to know any particular purpose for which the equipment is required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable equipment, there is an implied warranty that the equipment shall be fit for such purpose. This latter implied warranty on the sale of equipment is expressed in K. S. A. 84-2-315.

The final point raised by appellant which will be considered in this appeal is based on a claim that the trial court abused its discretion in refusing to submit special questions to the jury which would have indicated the theory or theories of liability upon which the verdict was based.

K. S. A. 60-249 provides a method of submitting issues of fact and requiring written findings by the jury. We have held that the submission of special questions under this statute lies in the sound discretion of the trial court. It may refuse to submit special questions even though they relate to issues of fact raised by the pleadings and evidence, and this court will not reverse such a decision absent a showing that the trial court abused its power of discretion. (*Thompson v. General Finance Co., Inc.*, 205 Kan. 76, Syl. ¶ 18, 468 P. 2d 269.)

The pretrial order in the present case sets forth nine separate issues of fact to be determined by the jury. The submission of at least some of these issues would have been helpful to the jury in arriving at a verdict on a proper theory of recovery. As previously pointed out the instruction covering an implied warranty as to quantity of water should not have been given. If special questions had been submitted and the jury had found no implied warranty was breached, the giving of the instruction on implied warranty would not have been prejudicial. The same might have been true as to express warranty.

However, the record fails to contain a demand by appellant on the particular issues of fact it desired to have submitted to the jury

on special questions. The appellant merely advised the trial court it desired to submit the same. When the court denied this oral request it failed to follow the matter up by filing the questions requested. If it had done so this court could evaluate the specific requests in light of the evidence and the pretrial order which set forth the issues of fact to be determined by the jury. In light of the record we cannot say there was prejudice or that the trial court abused its discretion in refusing to submit interrogatories to the jury.

One final question remains for our decision. The case was submitted to the jury on three theories and a general verdict was returned. We have decided the evidence was insufficient to support a verdict based on express warranty. We have further decided the jury was erroneously instructed that it might return a verdict based upon breach of a warranty as to the quantity of water obtained which could be implied from the driller's agreement to drill an irrigation well. We believe, however, there was sufficient evidence introduced and no error appears in submitting the case to the jury on the theory of negligence, failure to perform the work in a skillful and workmanlike manner and failure to provide proper equipment based upon the quantity of water available after the well was completed. Under the rules of law this court should disregard errors and irregularities which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining. (K. S. A. 60-2105; *Staudinger v. Sooner Pipe & Supply Corporation*, 208 Kan. 100, 110, 490 P. 2d 619.) Misleading instructions given may become immaterial where it conclusively appears from special findings that the jury was not influenced thereby. (C. f. *Angell v. Hester*, 186 Kan. 43, 348 P. 2d 1050.) It has been said a general verdict in a case resolves all controversial issues in favor of prevailing party. (*Diefenbach v. State Highway Commission*, 195 Kan. 445, 407 P. 2d 228; *Taylor v. State Highway Commission*, 182 Kan. 397, 320 P. 2d 832.)

However, the difficulty we find in applying the foregoing rules in this case stems from the refusal of the trial court to submit special questions. There are no special findings from which to determine lack of prejudice. Here two of three theories of recovery were tried to a jury upon a general verdict with erroneous charges. It seems obvious in this case that the rules as to nonprejudicial error cannot be applied. In fairness and justice we must hold under the circumstances of the case the general verdict

cannot be upheld. To hold otherwise would require speculation and conjecture that the general verdict was on the proper theory and not on improper theories. Under circumstances similar to those in this case the rule requiring a reversal has been variously stated. We state the rule as follows: In the absence of special findings by the jury, when an instruction is given on a theory of a case which is erroneous as a matter of law and the instruction is inclined to lead the jury to attach undue significance to evidence bearing upon another theory properly submitted, a reversal is required in the interest of fairness, even though the jury returned a general verdict. (*Hearst Corporation v. Cuneo Press, Inc.*, 291 F. 2d 714; *E. L. Cheeney Company v. Gates*, 346 F. 2d 197; *Angell v. Hester*, supra. See also 58 Am. Jur. 2d, New Trial, § 125, pp. 330, 331.)

Accordingly the verdict and judgment is set aside and the case is remanded for a new trial in accordance with the views expressed.